THE UNIVERSITY OF NORTH CAROLINA; THE UNIVERSITY OF NORTH
CAROLINA, D/B/A THE UNIVERSITY OF NORTH CAROLINA HOSPITALS
AT CHAPEL HILL; AND THE UNIVERSITY OF NORTH CAROLINA D/B/A
THE UNIVERSITY OF NORTH CAROLINA AT CHAPEL HILL, PLAINTIFF
v. LEE HENSLEY SHOEMATE AND RUBY C. STATON, DEFENDANTS

No. 9210SC251

(Filed 4 January 1994)

1. **Insurance § 889 (NCI4th) — self-insurance program — imposter
psychiatrist — medical malpractice coverage — validity of employ-
ment contract irrelevant**

The trial court erred as a matter of law in ruling that
the UNC Liability Insurance Trust Fund did not provide medical
malpractice insurance for defendant Shoemate when UNC ac-
cepted Shoemate as a resident in psychiatry, failed to check
his credentials as required by statute, and then allowed him
to work as a psychiatric resident for fourteen months, caring
for and treating patients, including defendant Staton, since
pursuant to the Supplemental Rules and Regulations of the
Trust Fund, the statute governing the creation of a self-
insurance program for health care liability, N.C.G.S. § 116-219,
and the Rules and Regulations for the Board of Governors
for the Liability Trust Fund Council, the Trust Fund provided
coverage against personal tort liability for any person or in-
dividual, whether an employee, agent or officer of UNC, work-
ing within the course and scope of his health care functions.
Therefore, the validity of Shoemate's employment contract
was totally irrelevant to the issue of whether there was malprac-
tice coverage for Shoemate's conduct against patient Staton.

**Am Jur 2d, Insurance § 726.**

2. **Insurance § 889 (NCI4th) — self-insurance program — coverage
of defendant posing as psychiatrist — conduct within scope and
coverage of health care functions — defendant as agent of
UNC — genuine issue of fact**

Defendant Staton presented a genuine issue of fact as
to whether defendant Shoemate was an individual health care
practitioner covered under the UNC Liability Insurance Trust
Fund where she offered evidence that Shoemate was appointed
to the position of resident in psychiatry and to house staff
as a house staff physician by UNC although he actually had

no medical degree; Shoemate examined Staton, diagnosed depression, and had her admitted to the psychiatric ward; Shoemate testified at a hearing which resulted in a 30-day involuntary commitment of Staton; Staton was ultimately diagnosed as having Crohn's disease and surgery was performed to remove part of her small intestines; Shoemate's conduct was within the course and scope of health care functions; and UNC permitted Shoemate to be represented as its agent.

**Am Jur 2d, Insurance § 726.**

Appeal by defendant from judgment entered 18 November 1991 by Judge Henry V. Barnette, Jr. in Wake County Superior Court. Heard in the Court of Appeals 4 March 1993.

*Yates, McLamb & Weyher, by Dan J. McLamb, and Barbara B. Weyher, for plaintiff-appellee.*

*Attorney General Lacy H. Thornburg, by Assistant Attorney General J. Charles Waldrup, for plaintiff-appellee.*

*Becton, Slifkin & Fuller, P. A., by Charles L. Becton, for defendant-appellant.*

*Donald B. Hunt for defendant-appellant.*

*Reckford, Gray & VanDerWeert, by Glenn E. Gray, for defendant-appellant.*

JOHNSON, Judge.

I.

On 5 January 1989, Shoemate applied for appointment as a resident in psychiatry at UNC-Chapel Hill (UNC). On his application, Shoemate represented that he had received his undergraduate degree from the University of Texas and that he was an M.D./Ph.D. student at Harvard Medical School with an anticipated graduation date of August 1989.

On 10 January 1989, Shoemate was interviewed by four members of the Department of Psychiatry and one resident in the Department of Psychiatry at UNC at which time he held himself out as a medical student at Harvard Medical School. He received an outstanding rating by all four interviewers. In addition, Dr. Preston

of the Department of Psychiatry received two letters of recommendation purporting to be from Alvin F. Poussaint, M.D., Associate Dean, Harvard Medical School and Daniel Perschonok, Ph.D., Lecturer on Psychology, Harvard Medical School.

On 20 February 1989, UNC offered Shoemate a position as a resident in psychiatry. Shoemate accepted the position the same day, and on 15 May 1989, Shoemate signed a contract, the Appointment to the House Staff Agreement.

Shoemate began his psychiatry residency on 18 July 1989. On 18 July 1989, Ruby C. Staton, then seventeen years old, came to UNC Hospital with symptoms of vomiting, bloody diarrhea, gastric pain and anemia. She was examined by Shoemate. He diagnosed depression and she was admitted to the psychiatric ward of UNC Hospitals.

Shoemate testified as a physician at a 4 August 1989 commitment hearing which resulted in the 30-day involuntary commitment of Ruby Staton. Staton was ultimately diagnosed as having Crohn's disease, an intestinal disease, and surgery was performed on 7 November 1989 to remove part of her small intestines. Meanwhile, Shoemate continued his residency at UNC for approximately fourteen months until 20 September 1990. During this time Shoemate examined, diagnosed, treated, involuntarily committed, and provided other health care services to numerous other patients in addition to Ruby Staton.

During the second year of his residency, Shoemate made application to the Board of Medical Examiners for a full medical license. As a part of its procedure in granting a license, the Board of Medical Examiners contacted the American Medical Association to verify Shoemate's credentials. On 19 September 1990, the American Medical Association reported to UNC that it had no file on Shoemate, and that Harvard Medical School had no record of Shoemate attending that institution. UNC then suspended Shoemate without pay from his positions as resident in psychiatry and house staff physician. His current whereabouts are unknown.

On 19 December 1990, Ruby C. Staton filed a civil action in Wake County Superior Court against Shoemate essentially for medical negligence. On 25 April 1991, UNC filed this suit against Shoemate and Staton in Wake County Superior Court seeking three things:

(1) a declaratory judgment against Shoemate and Staton that (a) Shoemate's employment agreement was void *ab initio* and (b) that UNC has no obligation to provide medical malpractice coverage to Shoemate including no obligation to cover Staton's claims (Second Claim for Relief — Declaratory Judgment);

(2) a judgment against Shoemate that (a) Shoemate's misrepresentations induced UNC to appoint Shoemate as resident in psychiatry and as house staff physician and to pay Shoemate an annual salary and (b) that UNC has been damaged in the amount of $27,452.91, the amount of Shoemate's salary (First Claim for Relief — Fraud); and

(3) a judgment against Shoemate finding the employment contract was void, or alternatively, should be rescinded and declared to be of no further force and effect (Third Alternative Claim for Relief — Rescission).

Ruby C. Staton accepted service, and Shoemate was served by publication. Staton's answer included a counterclaim for declaratory judgment that the UNC Liability Insurance Trust Fund (Trust Fund), UNC's equivalent of a malpractice insurance policy, provide coverage for the claims made by Staton against Shoemate.

UNC obtained an entry of default judgment against Shoemate and subsequently made three motions which were heard on 1 October 1991 and resulted in a judgment which is the subject of this appeal. The trial court entered judgment as follows:

1. Allowed UNC's motion for default judgment against Shoemate for $27,452.91 and entered a declaratory judgment that Shoemate's employment agreement and House Staff Agreement were void and that UNC provided no medical malpractice coverage to Shoemate whatsoever, including coverage for the claims made against Shoemate in *Staton v. Shoemate*;

2. Allowed UNC's summary judgment motion granting a declaratory judgment against Staton on UNC's declaratory judgment claim; and

3. Allowed UNC's motion for a summary judgment on Staton's first counterclaim for a declaratory judgment.

The trial judge amended the judgment to include a finding that there was no just reason for delaying the appeal. Ruby C. Staton filed timely notice of appeal with this Court.

UNIVERSITY OF NORTH CAROLINA v. SHOEMATE

[113 N.C. App. 205 (1994)]

II.

[1]  By defendant's first assignment of error, defendant contends that the trial court erred as a matter of law in ruling that the Trust Fund does not provide medical malpractice insurance for defendant Shoemate when UNC accepted Shoemate as a resident in psychiatry, failed to check his credentials as required by statute, and then allowed him to work as a psychiatric resident for fourteen months, caring for and treating patients, including defendant. We agree with defendant.

Appellate review of summary judgment focuses on whether the trial court properly concluded that there was no genuine issue of material fact and that the moving party was entitled to judgment as a matter of law. North Carolina General Statutes § 1A-1, Rule 56(c) (Cum. Supp. 1992).

In the instant case, the trial court ruled that the contract between UNC and Shoemate was void *ab initio*. UNC contends that because the employment contract between UNC and Shoemate is void *ab initio* the UNC Trust Fund did not provide coverage for Shoemate because he was not an employee of UNC. In addition, UNC contends that Staton, as a patient at UNC, is not a third-party beneficiary of Shoemate's employment agreement with UNC and has no standing to seek its enforcement.

Defendant argues, however, that the validity of Shoemate's employment contract is totally irrelevant to the issue of whether there is malpractice coverage for Shoemate's conduct against Staton where the malpractice insurance is not connected with an individual's employment contract with UNC. Rather, it is dependent upon an individual's conduct as a health-care practitioner working in UNC's hospitals, whether as an agent or employee of UNC.

In considering the parties' contentions, we must first determine whether Shoemate's right to the medical malpractice insurance was connected with the terms of his employment or whether Shoemate's right to the medical malpractice insurance was dependent on his conduct as a health-care practitioner working in UNC's hospital.

In the instant case, Shoemate signed an agreement entitled "The University of North Carolina Hospitals Appointment to House Staff Agreement." The agreement states in pertinent part:

UNIVERSITY OF NORTH CAROLINA v. SHOEMATE

[113 N.C. App. 205 (1994)]

Lee Shoemate is hereby appointed to the House Staff of The University of North Carolina Hospitals in the capacity of Second Year Postgraduate in the Department of Psychiatry at an annual stipend of $23,500 to be paid biweekly by the Department from August 1, 1990 to July 31, 1991 based on the following conditions.

The University of North Carolina Hospitals:

. . .

2. Agrees to provide professional medical malpractice insurance coverage. Members of the House Staff will be eligible to enroll in a group-rated health and hospitalization insurance plan[.]

. . .

The House Staff Physician/Dentist:

1. Agrees to abide by all applicable rules, regulations and policies of The University of North Carolina and its Clinical Departments, the University of North Carolina Schools of Medicine and Dentistry, the Board of Medical Examiners/Dental Examiners of the State of North Carolina and other appropriate governmental agencies and departments which may be in force.

. . .

3. Agrees to obtain a resident training license or full license from the North Carolina Board of Medical Examiners/Dental Examiners and submit a copy (unless a current copy is on file) to the House Staff Office of The University of North Carolina Hospitals prior to the effective date of this appointment. House Staff Physicians/Dentists will be reimbursed for the resident training license fee charged by the Board of Medical Examiners/Dental Examiners by their clinical department. . . .

Under the terms of the House Staff Agreement, UNC would provide the professional medical malpractice insurance pursuant to the agreement entered into by the parties. However, at the time Shoemate entered into the agreement with UNC, Shoemate had not attended medical school and was incapable of fulfilling his promise — namely, performing the services of a physician and undertaking the practice of medicine.

UNIVERSITY OF NORTH CAROLINA v. SHOEMATE

[113 N.C. App. 205 (1994)]

Under North Carolina law, where a contract is impossible to perform at the time it is made, consideration between the parties is lacking, and the contract is void *ab initio. Manhattan Life Ins. Co. v. Miller Machine Co.*, 60 N.C. App. 155, 298 S.E.2d 190 (1982). Therefore, if we look only at the House Staff Agreement, Shoemate would not be entitled to professional medical malpractice insurance as the contract between UNC and Shoemate was void *ab initio*.

However, examining the terms of the Trust Fund, we find the wording of the Supplemental Rules and Regulations governing the Trust Fund states that it "covers any person who may be charged with personal tort liability in the provision of health care services, if the charge is based upon conduct within the course and scope of health-care services undertaken by the person, with or without compensation, as a member of the governing board of, an officer or director of, an employee of, or an agent of a covered agent entity, or any person who is a duly enrolled student of the School of Medicine of the University of North Carolina." Covered entities are program participants identified as: "The School of Medicine of the University of North Carolina at Chapel Hill and The Medical Faculty Practice Plan of the School of Medicine of the University of North Carolina at Chapel Hill." The Trust Fund does not appear to provide coverage based solely on whether the person is an employee of UNC.

In addition, North Carolina General Statutes § 116-219 (1987), the statute which authorizes the establishment of a self-insurance program for health-care liability claims, states:

> The Board of Governors of The University of North Carolina . . . is authorized through the purchase of contracts of insurance or the creation of self-insurance trusts . . . to provide individual health-care practitioners with coverage against claims of personal tort liability based on conduct within the course and scope of health-care functions undertaken by such individuals as employees, agents, or officers of . . . (iii) North Carolina Memorial Hospital [now UNC Hospitals at Chapel Hill] . . . The types of health-care practitioners to which the provisions of this Article may apply include, but are not limited to, medical doctors . . . nurses, residents, interns, medical technologists, nurses' aides, and orderlies. . . .

Furthermore, the Rules and Regulations of the Board of Governors for the Liability Insurance Trust Fund Council provide:

Self-insurance provided pursuant to this Program shall be limited to expenses arising from:

(a) claims against individual health-care practitioners made upon alleged personal tort liability based on conduct, whether compensated, uncompensated, or volunteer, within the course and scope of health-care functions undertaken by such individuals as employees, agents, or officers, but not as independent contractors, of program participants. . . .

From a summary of the Supplemental Rules and Regulations of the Trust Fund, the statute governing the creation of self-insurance program for health-care liability, and the Rules and Regulations for the Board of Governors for the Liability Trust Fund Council, we find the Trust Fund provides coverage against personal tort liability for any person or individual whether an employee, agent or officer of UNC, working within the course and scope of their health-care functions.

[2] Therefore, if Staton showed through her pleadings, affidavits and supporting materials that Shoemate was an individual health-care practitioner, that the claim against Shoemate was a personal tort claim, that the work Shoemate performed on Staton arose out of the course and scope of his employment, and that Shoemate was an employee or agent of UNC at the time Shoemate provided medical services to Staton, there would appear to be a genuine issue of fact as to whether Shoemate is covered under the Trust Fund.

The Rules and Regulations of the Trust Fund define "individual health-care practitioners" in definition (j) as:

those who render health care to patients by direct ministrations or by indirect ministration upon orders of one who renders health care to patients by direct ministration; for example, medical doctors, medical residents, medical interns, nurses, nurses aides, orderlies, medical technologists, x-ray technicians, physical therapists, dieticians, dentists, dental hygienists, dental assistants, psychiatrists, psychologists, professional counselors, and chaplains.

In the instant case, defendant's pleadings and supporting materials showed that Shoemate was appointed to the position

of resident in psychiatry and to house staff as a house staff physician in 1989. In July 1989, Ms. Staton came to UNC Hospitals with certain symptoms. She was examined by Shoemate who diagnosed depression and she was admitted to the psychiatric ward. Shoemate, as one of her treating physicians, testified at a commitment hearing which resulted in a 30-day involuntary commitment of Staton. Staton ultimately was diagnosed as having Crohn's disease and surgery was performed to remove part of her small intestine. Shoemate, as a resident, met the definition of health-care practitioner as provided in UNC's health insurance because he rendered health-care to Staton and other patients by direct ministration or by indirect ministration upon orders of one who renders health care by direct ministration.

The Rules and Regulations of the Trust Fund further require that the claim against the individual health-care practitioners be made upon an alleged personal tort liability. The Rules and Regulations define tort as "a civil wrong to person or property independent of contract."

An examination of Staton's complaint against Shoemate shows that Staton alleged claims of wrongful commitment, fraud, lack of informed consent, reckless infliction of emotional distress, unfair and deceptive trade practices arising out of her hospitalization, medical negligence and falsifying medical records. All of these claims are civil wrongs to persons or property independent of contract and thus come within the definition of a tort.

Next, the Rules and Regulations require that the conduct must be "within the course and scope of health-care functions." "Health-care functions" are defined as:

(1) The ministration to the physical or mental well-being of patients, through clinical practice, (including preventative measures, consultation, counseling, analysis, diagnosis, or treatment), or

(2) Other general patient care support services for which expertise as a health-care practitioner is required.

Defendant presented the deposition of Dr. Pedersen to establish that Shoemate's conduct was within the course and scope of health-care functions. Dr. Pedersen testified that Shoemate interviewed Staton, and had a number of sessions to review the patient's history, and the patient's symptoms. Shoemate ordered lab tests and ordered

consultation from other specialists. He performed a physical examination and a mental status examination on Staton.

Dr. Pedersen further testified that he and Shoemate discussed treatment options with Staton in her hospitalization, discussed medication approaches, behavioral approaches to her eating disorder, and discussed short term and long term psychotherapy. From the testimony of Dr. Pedersen, we conclude Shoemate did provide services to Staton within the scope of health-care functions.

The Rules and Regulations apply only to conduct "within the course and scope of health-care functions undertaken by such individuals as employees, agents, or officers, but not as independent contractors, of Program participants." The Liability Trust Fund Council adopted Supplemental Rules and Regulations, including Article IV, which states in pertinent part that: "The program participants . . . are the University of North Carolina at Chapel Hill and the North Carolina Memorial Hospital [now the North Carolina Hospitals at Chapel Hill]." In addition, Article VI, Sec. B (2) of the Supplemental Rules defines "Covered Individuals" as follows:

A covered individual is any person who may be charged with personal tort liability in the provision of health care services, if the charge is based upon conduct within the course and scope of health care services undertaken by the person, with or without compensation, as a member of the governing board of, an officer or director of, an employee of, or an agent of a covered entity.

Contrary to UNC's argument, we find the Trust Fund does not require that the individual's conduct only be covered if he has a valid employment contract with UNC. Instead, the Rules and Regulations governing the Trust Fund allow coverage of claims against individual health-care practitioners made upon alleged tort liability based upon conduct whether it is compensated, uncompensated, or volunteer as long as it is within the course and scope of health-care functions undertaken by individuals as employees or agents. An agent of UNC is not synonymous with an employee of UNC.

An agent is "a person who is authorized by another to act for him, one intrusted with another's business." *Black's Law Dictionary* p. 59. The evidence established that Shoemate wore a name tag "MD", performed examinations, ordered lab tests, ordered con-

UNIVERSITY OF NORTH CAROLINA v. SHOEMATE

[113 N.C. App. 205 (1994)]

sultations with specialists and interacted with other doctors and patients as if he were a medical doctor. From the evidence presented, we find Shoemate acted as an agent of UNC.

We have acknowledged UNC's argument that the contract between UNC and Shoemate was void *ab initio* and that UNC has no contractual obligation to Shoemate. However, we cannot ignore the relationship between UNC and Shoemate which gave him access to treat, diagnose and involuntarily commit patients such as Staton.

"Where a person, by words or conduct, represents or permits it to be represented that another is his agent, he will be estopped to deny the agency as against third persons, who have dealt, on the faith of such representation, with the person so held out as agent, even if no agency exists in fact." *Barrow v. Barrow*, 220 N.C. 70, 72, 16 S.E.2d 460, 461 (1941). We find UNC did permit Shoemate to be represented as its agent.

We have determined from the evidence that there is a genuine issue of fact as to whether Shoemate was an individual health-care practitioner covered under the Trust Fund.

UNC also argues that Staton is not a third-party beneficiary and therefore not entitled to any contractual benefits between UNC and Shoemate. However, North Carolina law states that "anyone for whose benefit an insurance policy is issued, covering the legal liability of the insured (as distinguished from a mere indemnity insurance contract) may maintain an action directly against the insurer." *Ingram v. Nationwide Mut. Ins. Co.*, 258 N.C. 632, 638, 129 S.E.2d 222, 227 (1963).

From the record, we find Staton asked the court to determine whether the Trust Fund provides coverage against Shoemate in the action for *Staton v. Shoemate*. Since the evidence establishes that the Trust Fund does provide medical malpractice coverage, we hold the trial court erred when it granted: a declaratory judgment against Staton holding that plaintiff provides no medical malpractice coverage to Shoemate whatsoever; a summary judgment against Staton on UNC's declaratory judgment claim (second claim for relief); and UNC's summary judgment against Staton on Staton's first counterclaim for declaratory judgment.

## III.

By defendant's second and third assignments of error, defendant contends the trial court erred in granting summary judgment against Shoemate on UNC's fraud claim and UNC's rescission claim. We disagree.

Defendant attacks the trial court's order granting summary judgment against Shoemate on the issue of contract fraud and rescission. As against Shoemate, however, these issues have been conclusively resolved by virtue of the default judgment. Since Shoemate failed to answer the complaint in this matter, all of UNC's allegations are deemed admitted.

At the trial court level, defendant did not bring a motion to set aside the default judgment pursuant to Rule 55(d) of the North Carolina Rules of Civil Procedure or otherwise challenge the default judgment. Counsel for defendant at no time made an appearance on behalf of Shoemate or indicated an intent to represent him. Failure to attack the judgment at the trial court level precludes such an attack on appeal. *Collin v. Highway Commission*, 237 N.C. 277, 74 S.E.2d 709 (1953). As such, defendant is now precluded from challenging the default judgment against Shoemate.

We reverse the decision of the trial court as to issue one and affirm the decision of the trial court as to issues two and three.

Judges LEWIS and JOHN concur.